# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                           Case No. 11-CR-16

LUIS G. DELGADO,

        Defendant.

_____

# ORDER

On January 19, 2011, a federal grand jury issued a two count indictment against the defendant, Luis G. Delgado ("Delgado"). (Docket #1). At the first count, the indictment charged that on or about December 29, 2010, Mr. Delgado violated 18 U.S.C. §§ 922(g)(1) and 924(a)(2), which collectively make it unlawful for a person who has been convicted of a crime punishable by imprisonment for a term exceeding one year to possess any firearm or ammunition. *Id.* ¶¶ 1-3. Specifically, the indictment alleged that Mr. Delgado possessed one 20 gauge short barreled pump shotgun, one 410 gauge bolt action shotgun, and approximately 314 rounds of ammunition. *Id.* ¶¶ 2-3. At count two, the grand jury charged that Mr. Delgado knowingly possessed a firearm that was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5681 and 5871. On May 12, 2011, the defendant was arraigned and entered a plea of not guilty to both charges. (Docket #2).

Less than a month later, on June 1, 2011, Mr. Delgado, through his attorney, moved to suppress: (1) "any and all physical evidence recovered by City of Milwaukee police officers, on or about December 29, 2010, during their . . . search of his home," including the two firearms and the ammunition that are the basis of the charges in the underlying indictment; and (2) "any and all statements [the defendant] made in response to questioning by" a City of Milwaukee police officer "while outside of his residence and handcuffed and seated inside a police squad car." (Docket #8). In conjunction with his motion to suppress, Mr. Delgado proffered a series of facts summarizing the factual predicate for his motion. *Id.* ¶ 5. Five days later, the government wrote a letter to Magistrate Judge William E. Callahan, Jr., the assigned magistrate judge who would initially review the defendant's motion, to advise the court that "no material disputed facts are known with respect to the motion to suppress . . . that would require an evidentiary hearing." (Docket #9). A week later, the government provided its response to the motion to suppress, including its view of the facts underlying the matter. (Docket #10). After the defendant had an opportunity to respond to the government's brief in opposition (Docket #11), Magistrate Callahan issued a recommendation that this court should grant Mr. Delgado's motion in its entirety. (Docket #12). The government has filed an objection to the report and recommendation (Docket #13), and this court is now obliged to make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.

§ 936 (b)(1)(C); *see also Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir. 1986). As such, the district court can adopt the magistrate's recommendation in part or in its entirety or reject the magistrate's findings. *Id.* at 82. Moreover, if necessary, the district court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). In sum, the district court has the "widest discretion" possible when deciding whether to adopt a magistrate's report. *United States v. Jaramillo*, 891 F.2d 620, 628 (7th Cir. 1989). With these principles in mind, the court begins by noting the facts that underlie Mr. Delgado's motion based on the record that exists to date.

## BACKGROUND

In the early afternoon of December 29, 2010, City of Milwaukee Police Officer Glenn Podlesnik ("Podlesnik") was dispatched to the 1900 block of South 12th Street in Milwaukee due to a report that "shots" were fired in a nearby alley. (Docket #8 ¶ 5(a); Docket #10 at 1). Upon arriving at the location he was dispatched to, Officer Podlesnik witnessed a Hispanic male running from the alley area toward 1830A South 13th Street, a location to the northwest of the initial dispatch area. (Docket #8 ¶ 5(b); Docket #10 at 1). The police officer noted that the Hispanic male was clutching his left waistband as he was sprinting from the alley, making it appear as if he was holding some sort of firearm. *Id.* The 1830A South 13th Street location is a second-floor apartment in a building that also houses a tavern ("1832") and another apartment ("1830"). (Docket #8 ¶ 5(c)). The only means to access the

apartment at 1830A South 13th Street is to open a door located in the back of the central building and to proceed up a flight of stairs.[1]  (Docket #8 ¶ 5(c); Docket #10 at 1-2).

As Officer Podlesnik followed the Hispanic male toward 1830A South 13th Street, a citizen witness approached the police officer, informing him that the witness' cousin, Adrian Aviles ("Aviles"), had just called the witness to state that he had been shot and was inside the second-floor apartment.   (Docket #8 ¶ 5(e); Docket #10 at 2).   The witness further explained that Mr. Aviles told her that a black male, a neighbor of the witness, had shot the witness' cousin in the alley, prompting Mr. Aviles to flee to the 1830A apartment.  *Id.*  Officer Podlesnik, joined by fellow officers, proceeded to the entrance of the 1830A apartment and knocked on the apartment door.[2]  (Docket #10 at 2).  After getting no response, the police prepared to force their way "into the building" (Docket #8 ¶ 5(f)), but before they could, the door opened, and Mr. Aviles came outside.  (Docket #10 at 2).  Upon examining Mr. Aviles, the police noted that he had a graze wound to his right wrist area.  (Docket

---

[1] There is no evidence in the record to indicate that this fact was readily apparent to the officer's at the scene, however.

[2] Unclear to the court, from the parties' submissions and the magistrate's report is whether the police were knocking on the door that was the outside entrance to the apartment *building* or the door of the actual apartment.   The defendant's motion references officers forcing "entry into the building,"  (Docket #8 ¶ 5(f)), whereas the government's response is ambiguous and almost seems to imply that the officers were knocking on the door inside the building.  (Docket #10 at 2) ("Mr Aviles opened the door from inside the apartment . . .").  Given the United States' concession that it does not dispute the facts contained in the motion to suppress (Docket #9), the court assumes that any ambiguity needs to be resolved in favor of the defendant's description of the event in the motion suppress – i.e., the court assumes that Mr. Aviles and Mr. Delgado first interacted with the police outside of the door to the apartment *building* in the alley below 1830A South 13th Street.

#8 ¶ 5(g); Docket #10 at 2). Following Mr. Aviles out of the building was the defendant, Mr. Delgado, who identified himself as the sole resident of the 1830A apartment. (Docket #8 ¶ 5(h); Docket #10 at 2). Officer Podlesnik recognized Mr. Delgado as the individual he had just seen running from the alley. (Docket #8 ¶ 5(I); Docket #10 at 2). After ordering the defendant to put his hands up, police officers at the scene handcuffed Mr. Delgado and placed him in a police squad car. (Docket #8 ¶ 5(j); Docket #10 at 2).

Police officers then entered the building and proceeded into the 1830A apartment to perform a sweep of the residence. (Docket #8 ¶ 5(k); Docket #10 at 2). Upon looking in a closet in Mr. Delgado's bedroom, the officers found three rifles and three shotguns, including a sawed-off shotgun and ammunition. (Docket #8 ¶ 5(l); Docket #10 at 2). After the discovery of the weapons in the apartment, Officer Podlesnik returned to the police squad car to ask Mr. Delgado who lived at the 1830A apartment and to seek consent to search the apartment. (Docket #8 ¶ 5(m); Docket #10 at 2). Mr. Delgado informed the police officer that the defendant's mother's name was on the lease, but he rented the apartment from his mother. *Id.* The defendant consented to a police search of the apartment, and, as a consequence, a second search followed. (Docket #8 ¶ 5(m-n); Docket #10 at 2).

Following the second search of the apartment, Officer Podlesnik approached Mr. Delgado, who remained seated inside the police squad car, and inquired if he had ever been arrested. (Docket #8 ¶ 5(o); Docket #10 at 3). Mr. Delgado

responded that he had been arrested for "armed robbery party to a crime." *Id.* The police officer followed up by asking if the defendant had been convicted of that charge, to which Mr. Delgado responded affirmatively. *Id.* Finally, Officer Podlesnik, confirming the previous answers the defendant had provided, asked if Mr. Delgado was a convicted felon, which the defendant verified. *Id.* The police had not, to this point, given the defendant his *Miranda* warnings. *Id.* Less than a month later, the grand jury issued its indictment in this matter. (Docket #1). With this factual background in mind, the court proceeds to determine the legal efficacy of Mr. Delgado's motion to suppress.

## ANALYSIS

The motion to suppress raises three distinct arguments: (1) the police handcuffing of Mr. Delgado outside of the building at 1830A South 13th Street and placing him in a squad car was unlawful; (2) the searches of the apartment were unlawful, and (3) the statements made by Mr. Delgado in response to Officer Podlesnik's questioning were obtained in violation of the defendant's *Miranda* rights. (Docket #8 ¶ 13). The court will address each argument in turn.

### A. Did the police act unlawfully in handcuffing the defendant and placing him in a squad car?

The court begins with the government's justification for handcuffing Mr. Delgado and placing him in the squad car after the police encountered the defendant at the 1830A apartment. The government contends, and the magistrate agreed, that Mr. Delgado's detention occurred under the auspices of a *Terry* investigative

stop. Pursuant to the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, a law enforcement officer "can execute 'an investigatory stop'" to verify suspicions that a person has been, is, or is about to engage in criminal activity. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (internal citations omitted); *see also United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009) ("Although an officer does not need probable cause to conduct an investigatory stop, the brief detention must be based on reasonable suspicion that the stopped individual has or is about to commit a crime."). A *Terry* stop is less restrictive than an arrest and is, therefore, necessarily limited in scope and duration. *Id.* Accordingly, when determining whether a particular seizure "exceeds the bounds of a *Terry* stop," the court must inquire into two separate, but related issues: (1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011).

**1.    Did the police have reasonable suspicion to detain the defendant?**

To determine whether the police officers who detained Mr. Delgado were "able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity," *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry,* 392 U.S. at 21-22), the court must first examine what the "reasonable suspicion" standard entails. However, as the Seventh Circuit has observed, reasonable suspicion is a hard term to define precisely. *United States v. Lawshea*,

461 F.3d 857, 859 (7th Cir. 2006). The courts have stated that reasonable suspicion requires "more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Gentry,* 597 F.3d at 845. Put another way, reasonable suspicion is a "lower threshold than probable cause and does not deal with hard certainties, but with probabilities." *Booker,* 579 F.3d at 839. Ultimately, this court must take a "commonsense, nontechnical" view of what "reasonable suspicion" of a crime means, examining the "factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians act.'" *Lawshea,* 461 F.3d at 859. As such, the reasonableness of a stop must be based on an objective standard of whether the "facts available to the officer at the moment of the seizure" would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Tilmon,* 19 F.3d at 1224. To make such a determination, the court should assess the "totality of the circumstances" known to the officer at the time of the stop and "common-sensical judgments and inferences about human behavior." *Gentry*, 597 F.3d at 845 (internal citations omitted).

Applying these principles to the case at hand, the court can readily conclude that Officer Podlesnik had reasonable suspicion to suspect a crime had or was occurring. Indeed, the situation that the police officer faced on December 29, 2010, was quite grave. The police officer, after being dispatched to investigate a mid-day shooting in an urban area, witnessed a man sprinting from the scene of shooting – and presumably the police – toward the 1830A South 13th Street address while

suspiciously holding his side.[3]  Officer Podlesnik was then told that the victim of the shooting was taking shelter in the exact location where the sprinting man was running toward, prompting the police to immediately attempt to enter the apartment. After the shooting victim exited the building, Mr. Delgado followed him out the door. This court has little problem concluding that the police had a sound reason – indeed, more than a mere hunch – to suspect that Mr. Delgado, if he had not just shot Mr. Aviles, was in someway involved in the criminal incident.  Moreover, the police have the discretion to briefly detain a subject in order to maintain the status quo pending further investigation. *See Adams v. Williams*, 407 U.S. 143, 146, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972).  The only remaining question is whether the degree of Mr. Delgado's intrusion was reasonably related to the known facts.  *Bullock*, 632 F.3d at 1012.

**2.     Was the degree of intrusion Mr. Delgado encountered during his detention reasonably related to the known facts?**

The defendant's central argument for why his initial detention on December 29, 2010, was unlawful is that his detention exceeded the scope of a *Terry* stop. Specifically, the defendant contends that the seizure constituted an arrest, as opposed to an investigative stop, because he was handcuffed and placed in a squad car.   (Docket #11 at 2-3).  These arguments are non-starters.  The court finds nothing unreasonable about a squad car, as opposed to a city alley, being the site

---

[3] The court can only surmise that the police officers reasonably concluded that the sprinting man was holding his side because he was holding an object, such as a weapon.

of an investigatory stop occurring in the middle of a winter day in Milwaukee. Moreover, given the reasonable suspicion that Mr. Delgado was just involved in a shooting, the police acted reasonably in placing the defendant in a location that minimized the threat to public safety and maintained the status quo. *See Jewett v. Anders*, 521 F.3d 818, 827 (7th Cir. 2008) (finding that placing an individual in a squad car does not convert a *Terry* stop into an arrest); *see also United States v. Boyett*, 295 Fed. Appx. 781, 785 (6th Cir. 2008) ("Placing a subject in a squad car can be justified in order to secure the scene, particularly when the police do not question the subject while in the squad car.") Additionally, the fact that the police used handcuffs in their seizure of Mr. Delgado does not suddenly transform his detention into an arrest. *See United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) ("[Handcuffing] does not automatically turn a *Terry* stop into an unlawful arrest"); *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993) ("We have been unwilling to hold that the handcuffing of a suspect without probable cause is unlawful per se.") Instead, the court finds that handcuffing Mr. Delgado, a suspect in a potential shooting, was a reasonable approach to gain some sort of control over fairly chaotic circumstances. More importantly, it is wholly inappropriate for this court, with the benefit of hindsight, to secondguess a police officer's "belief that, in order to safely effectuate the stop and confirm or dispel their suspicion that [the defendant] was committing a crime, [he] had to place [the defendant] in handcuffs." *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989).

The defendant argues that the police should have first interrogated Mr. Aviles and Mr. Delgado before they detained the defendant. (Docket #11 at 4). The court will not indulge in such Monday morning quarterbacking. First, had the police first questioned the two individuals who ran out of the apartment, the officers would have left themselves potentially vulnerable to threats lurking in the apartment. Given the inherent limits on the resources of the police, the court finds that the strategy of detaining the defendant and securing the apartment and the surrounding area before questioning Mr. Delgado was a sound one. Second, and more importantly, as the Supreme Court has noted, a "creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686-687 (1985). However, the "fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* (internal citations omitted). Ultimately, the court concludes that it was reasonable for the officers to "exercise unquestioned command of the situation" facing them by handcuffing Mr. Delgado and placing him in the police squad car long enough to ensure that he was "unarmed and uninvolved in criminal activity."[4] *United States v. Jennings*, 544 F.3d 815, 818-19 (7th Cir.

---

[4] The defendant does not argue that the duration of the detention was excessive. The record, while incomplete on this issue, does not provide any indication that the length of Mr. Delgado's initial detention was any longer than necessary under the circumstances facing the police officers at the scene.

2008).   As such, the court proceeds to examine whether the searches of the apartment were unlawful.

**B.     Did the police act unlawfully in performing two searches of the 1830A apartment?**

The Fourth Amendment to the United States Constitution "protects the 'right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"   *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (quoting U.S. Const. amend. IV).   A "search" occurs when an "expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).   It is undisputed that the police officers performed a "search" within the meaning of the Fourth Amendment when they, following their detainment of Mr. Delgado, proceeded without a warrant into his apartment and opened the door to a closet containing the weapons and ammunition.   The central issue, therefore, is whether the actions taken by the police were reasonable.

Warrantless searches and seizures within a home are considered presumptively unreasonable and a violation of the Fourth Amendment.   *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007).   However, warrantless searches are constitutionally permissible "under certain narrowly proscribed exceptions." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010).   The government suggests that two exceptions to the warrant requirement justified the police officers' search of Mr. Delgado's residence.   The government bears the burden of

demonstrating that the search performed fits within an exception to the warrant requirement. *United States v. Arch*, 7 F.3d 1300, 1302 (7th Cir. 1993). The court reviews each argument in turn.

### 1. Exigent Circumstances

The government first argues that "exigent circumstances" allowed the police officers to search the defendant's residence without a warrant. Indeed, "one well-recognized exception" to the warrant requirement for searches inside a home is "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 179 L. Ed. 2d 865, 131 S. Ct. 1849, 1856 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The Supreme Court has "identified several exigencies that may justify a warrantless search of a home," *King,* 131 S. Ct. at 1856, such as when an officer must enter a premises "to render emergency assistance to an injured occupant or protect an occupant from imminent injury," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), to pursue a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43 (1976), and to prevent the imminent destruction of evidence. *Schmerber v. California*, 384 U.S. 757, 770-771. Here, the government has asserted that the "exigency permitting an exception to the warrant requirement [in this case] . . . is the often recognized need to assist persons who are seriously injured or threatened with such injury" (Docket #13 at 3), i.e., the emergency aid doctrine.

With respect to the government's emergency aid exception argument, the central issues are the level of proof the government needs to demonstrate that their warrantless entry into the house was lawful and whether the government has met their burden. The magistrate's recommendation posited that the requirement the government needed to demonstrate that exigent circumstances existed was "probable cause." (Mag.'s Rep. at 6). The reference to probable cause confuses the issue substantially, however.[5] The magistrate cited to the case of *Kirk v. Louisiana,* 536 U.S. 635, 638 (2002), for the proposition that a showing of "probable cause" is needed to demonstrate that exigent circumstances exist to justify a warrantless entry into a home. However, *Kirk* was a *per curiam* order of the Supreme Court in the context of a warrantless *arrest* in the home based on a simple application of *Payton v. New York*, 445 U.S. 573, 590 (1980), which likewise held that a warrant or "probable cause plus exigent circumstances" were needed to make a lawful entry into a home to make an arrest. *Id.* ("In terms that apply equally to *seizures* of property and to *seizures* of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Here, there is no

---

[5] This is not to say that the magistrate was misstating the law. Rather, the Seventh Circuit, at times, when applying the "exigent circumstances" doctrine, have wholesale adopted a separate probable cause prong to satisfy the doctrine. *See United States v. Venters*, 539 F.3d 801, 807 (7th Cir. 2008); *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006); *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001). The origin of the basis for the Seventh Circuit's citation is *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998), which in turn cited to *Payton v. New York,* 445 U.S. 573, 590 (1980). For reasons discussed above, the court has some skepticism as to whether a separate probable cause prong is required in the context of the emergency aid doctrine.

assertion by the government that the police entered Mr. Delgado's apartment to arrest anyone, so it is difficult to see how *Kirk* or *Payton* are directly applicable. More importantly, "probable cause" – a phrase that modifies the warrant requirement of the second clause of the Fourth Amendment – is used in federal criminal procedure in reference to a "search" for evidence of a crime, *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (holding that a magistrate may issue a search warrant "so long as the magistrate had a 'substantial basis for . . . concluding' that a search would uncover evidence of wrongdoing"), or a "seizure" in the context of issuing an arrest warrant. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084-2085, 179 L. Ed. 2d 1149 (2011) (holding that the Fourth Amendment allows arrest warrants to be issued on "probable cause to suspect a violation of law.") Given that the government's argument with respect to exigent circumstances has nothing to do with a search for evidence or a seizure of a person suspected of a crime, – the government says the police were merely rendering emergency aid in entering the apartment – the magistrate's reliance on

"probable cause" as the basis of evaluating the emergency aid exception issue was misplaced.[6]

Nonetheless, the court concurs with the ultimate conclusion the magistrate reached with respect to the emergency aid argument proffered by the government. It is incumbent on the government to show that "exigent circumstances justified an officer's warrantless entry." *Venters*, 539 F.3d at 807. Police officers do not need "ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 130 S. Ct. 546, 549, 175 L. Ed. 2d 410 (2009). Rather, to satisfy its burden, the government must establish, based on the situation from the perspective of the officer at the scene, that the officer had "an objectively reasonable basis for believing" that "medical assistance was needed, or persons were in danger." *Id.; see also Venters,* 539 F.3d at 807; *Sheik-Abdi*, 37 F.3d at 1244

---

[6] Indeed, if there needs to be "probable cause" that a crime occurred for the emergency aid exception to be applicable that would necessarily prevent the police from entering a home without a warrant and in the absence of any evidence of criminal activity when there was substantial evidence that a person inside the home was in need of immediate medical attention. Such a rule would stand in contrast to long standing Supreme Court precedent. *See McDonald v. United States*, 335 U.S. 451, 454 (1948) (finding that exigent circumstances include cases where "the officers, passing by on the street, hear a shot and a cry for help"); *Mincey*, 437 U.S. at 392 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency"); *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (describing the police's community caretaking function as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994) ("A related, though not identical, line of cases also has recognized that emergency situations sometimes arise and on such occasions a warrantless entry into a home will be appropriate for a purpose other than to arrest a suspect or search for evidence of a crime"); *see generally* John F. Decker, Emergency Circumstances, *Police Responses, and Fourth Amendment Restrictions*, 89 J. Crim. L. & Criminology 433, 448-53 (1999) (arguing that the muddling of typical exigent circumstances analysis with the emergency aid doctrine causes "courts to unnecessarily look for probable cause . . . where a straightforward community caretaking analysis would avoid such hurdles.")

("[T]he burden falls upon the officer to show the existence of an objectively reasonable belief that his intrusion was made to 'render assistance or prevent harm to persons or property within'") (internal citations omitted).   However, in this case, the record is devoid of any evidence that anyone within Mr. Delgado's apartment was hurt or otherwise in need of police assistance at the time the police entered the defendant's apartment.   By the time the police opted to enter the apartment in question, the only victim of a shooting that the police had any evidence existed was no longer in Mr. Delgado's apartment, but rather had exited that apartment.   The government even concedes that the police "did not know whether one or more persons . . . was in the apartment in need of immediate medical help." (Docket #13 at 5).   The government has no right to enter a private residence on a mere whim that a person in need of assistance may be inside; instead, the government needs an objectively reasonable basis for entering the apartment.[7]   *Fisher*, 130 S. Ct. at 549.   In this case, the evidence here does not show that the government had an

---

[7] The government argues that the mere presence of guns "justify exigent circumstances searches."  However, in the cases cited by the government, such as *Huddleston*, the objectively reasonable basis for entering the residence was not just the isolated fact that a gun was in the residence – that fact standing alone would justify the government raiding any residence that was known to contain a gun – but that the gun had the potential to be used by someone.  593 F.3d. at 600 ("[T]here was a real risk that Huddleston – who was fully clothed, sitting up and holding the gun – could awaken at any time.").

objectively reasonable basis for entering the apartment for the purpose of rendering emergency aid.[8]

## 2. Protective Sweep

The government's second and far more cogent argument for why the search of Mr. Delgado's apartment was lawful is that the search was within the permissible scope of a "protective sweep." (Docket #10 at 7). In *Maryland v. Buie*, the Supreme Court first identified the "protective sweep" as an exception to the warrant requirement of the Fourth Amendment. 494 U.S. 325, 334 (1990). Specifically, the Court described two circumstances where the police, to ensure their own safety without unnecessarily intruding on the Fourth Amendment rights of a criminal defendant, could engage in a "quick and limited" "visual inspection of those places in which a person might be hiding" in a premises. *Id.* at 327. First, officers, "as an incident to the arrest" and "as a precautionary matter and without probable cause or reasonable suspicion," are permitted to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Second, where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger," the search may extend beyond the parameters of the first type of protective sweep. *Id.*

---

[8] The government makes passing references to the argument that an entrance was needed to secure the apartment. This argument sounds more of the "protective sweep" exception to the warrant requirement, and, as such, the court will analyze the government's contention under that rubric.

Such a sweep must not last "longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335-36. In this case, it is undisputed that the search performed by the police falls under the second set of circumstances provided by *Buie*, as the police were not performing their search in the immediate area in which Mr. Delgado was detained.[9] Moreover, it is undisputed that the officers' search did not exceed the scope under the second set of circumstances envisioned by *Buie* – the search of the closet was a quick and limited inspection of a place where a person could have been hiding. 494 U.S. at 327. However, the fundamental issue is whether the protective sweep doctrine is even *applicable* to the facts of the case. The defendant makes two central arguments for why the police could not enter Mr. Delgado's apartment and perform a protective sweep

The defendant first argues that the protective sweep doctrine is inapplicable here because Mr. Delgado was not *arrested* and a legally permissible protective sweep can only be done in the context of a search incident to arrest. (Docket #11 at 7). The magistrate likewise stated that it was an open question as to whether the principles espoused in *Buie* extend to the non-arrest context. (Docket #12 at 10

---

[9] The magistrate spent a considerable amount of his recommendation discussing whether a protective sweep of a person's residence can occur when a person is detained "just outside of the home." (Docket #12 at 10-11). This court concludes that this issue is not a complicated one, however, as the Seventh Circuit has already held that an "[e]ntry into a domicile" can occur without a warrant when the entry is a mere "quick inspection" justified by "lower degrees" of suspicion, such as with a "protective sweep." *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995); *see also United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995) ("[O]fficers may be at as much risk while in the area immediately outside the arrestee's dwelling as they are within it."); *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993) (recognizing that arresting officers face similar dangers whether they are inside or just outside an arrestee's dwelling).

-19-

n.1).  The court does not find the issue as cloudy as the magistrate found it to be and ultimately disagrees with the defendant's first argument.  The magistrate and the defendant cite to the case of *United States v. Johnson,* 170 F.3d 708, 716 (7th Cir. 1999), a case involving the pat-down search and detention of a *person* outside of his apartment, where there was "no reason to believe that [the defendant] was carrying a weapon or any kind of illegal substances at the moment he emerged from the apartment."  *Id.* at 714.  In dicta, the Seventh Circuit discussed *Buie,* noting that it would be a "significant expansion of *Buie* to hold that it applied to a seizure and subsequent search of a person for whom there is no arrest warrant, at the threshold of a dwelling for which there is no search warrant."  *Id.* at 716.  The dicta from *Johnson* is not only unpersuasive because the divided panel in that case was discussing *Buie's* application to a search of a *person* – a far more intrusive search than the typical protective sweep – but also because the Seventh Circuit has since repudiated an interpretation of the *Johnson* case that stands for the rule that *Buie* is limited to the arrest context.  *See Leaf v. Shelnutt*, 400 F.3d 1070, 1087-1088 (7th Cir. 2005) ("The underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a dwelling . . . [a]ccordingly, it was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified"); *see generally* Leslie A. O'Brien, *Finding A Reasonable Approach To The Extensions Of The Protective Sweep Doctrine In Non-Arrest Situations*, 82 NEW YORK UNIV. L. REV. 1139, 1156

(Oct. 2007) ("The majority of circuits have extended the *Buie* protective sweep doctrine to situations where officers have lawfully entered a home for reasons other than an arrest."). Indeed, last June, the Seventh Circuit applied the protective sweep doctrine in a case outside of the context of an arrest.[10] *See Skrzypek v. United States*, Nos. 10-2804 & 10-2805, 2011 U.S. App. LEXIS 13601, at *7-8 (7th Cir. June 29, 2011) (upholding the legitimacy of a protective sweep into a garage attic to see if a "person might be lurking" there performed by an officer seizing a car in a garage). Accordingly, given the precedent in the Seventh Circuit, the court concludes that a law enforcement officer can perform a protective sweep of an area outside of the context of when a person is lawfully arrested.

In addition, the defendant argues for the first time[11] in his response to the government's objections that the police did not provide "specific and articulable facts" "sufficient to justify a protective sweep." (Docket #14 at 6). Mr. Delgado's argument warrants an examination of the nature of the government's burden in showing that a protective sweep was warranted. Under *Buie*, a protective sweep of an area of the residence outside of the immediate vicinity of where a person has been detained "may be conducted only when justified by a reasonable, articulable

---

[10] In fact, the lower court, whose decision was affirmed in its entirety by the Seventh Circuit, in applying the *Leaf* decision, held that *Buie* applies outside of the context of an arrest. *See Skrzypek v. United States*, No. 07 C 5753&07 C 5754,No. 97 CR 516, 2010 U.S. Dist. LEXIS 38573, at *18-22 (N.D. Ill. Apr. 20, 2010). The Seventh Circuit did not comment on this rather uncontroversial statement by the lower court in its affirmation of the decision.

[11] Before the magistrate, the defendant limited his argument to the issue of whether the protective sweep doctrine applies to an arrest. (Docket #11).

suspicion that the house is harboring a person posing a danger to those" on the scene. 494 U.S. 325 at 336. "A protective sweep is not justified where there is a 'mere inchoate and unparticularized suspicion or hunch' of danger." *United States v. Tapia*, 610 F.3d 505, 510 (7th Cir. 2010) (internal citations omitted). Whether a protective sweep was justified by the circumstances facing the police necessitates a "very fact-specific" inquiry. *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). Indeed, the Seventh Circuit has called for a "careful, detached and demanding scrutiny" of the facts behind a protective sweep, *id.* at 1018, looking at a series of factors such as the "configuration of the dwelling" in question, the "characteristics of those known to be present and who might be present," and the nature of the "general surroundings, especially its history in previous law enforcement efforts."[12] *Id.* at 1016. The court needs to evaluate these factors through the lens of what was reasonably known to the officer at the time the protective sweep occurred. *Brigham City,* 547 U.S. at 404. Moreover, any analysis regarding the reasonableness of a protective sweep "requires that the circumstances of the particular encounter be assessed carefully in light of the overarching policy concerns articulated" by the Supreme Court in *Buie* and its progeny, including a "proper regard" for the safety of police officers, who "have an interest in ensuring their safety when they lawfully enter a house." *Leaf,* 400 F.3d at 1087 ("[T]hat

---

[12] Given the fact intensive nature of an inquiry into the lawfulness of a protective sweep, the court questions the wisdom of both sides failing to request an evidentiary hearing in this case, in which the facts could have been far more fully developed. Nonetheless, the court can make a decision based on the record before it.

interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack.").

Applying these principles to the case at hand, the court finds the government has shown articulable facts that would have warranted a reasonably prudent officer in believing that Mr. Delgado's apartment harbored an individual posing a danger to those on the scene.  While the court finds the case for a warrantless search of the defendant's apartment is far from a "slam dunk," the undisputed facts speak to the extreme danger that faced the police on December 29, 2010.  The police were called to the scene of a violent shooting that occurred in an alley of an urban area in the middle of a winter day.  Upon arriving on the scene of the incident, the police soon learned at least four critical facts.  First, the law enforcement officer discovered that the person who had been shot in the alley had taken shelter in a nearby apartment.  Second, the police witnessed another man, holding what appeared to be a firearm, sprinting from the alley toward the same exact apartment housing the victim of the incident.  Third, the police learned of the existence of a third man, who had done the shooting in the alley and whose whereabouts were unknown.  Fourth, the victim and the sprinting man emerged unarmed from the apartment where the victim had taken shelter.

Based on the specific facts known to the officers who were situated in the open doorway of Mr. Delgado's apartment, the court finds that they could make several extremely rational inferences from those facts.  First, from the fact that the

victim – who was not a resident of the 1830A apartment – gained access to the defendant's residence with relative ease in the aftermath of the shooting, the police could conclude that Mr. Delgado's apartment was readily accessible to those who wanted to enter it. Second, based on the fact that the sprinting man who Officer Podlesnik had just witnessed to be in the apparent possession of a firearm had just exited the apartment unarmed, the police could surmise that a gun remained in Delgado's apartment. Couple that fact with the knowledge that a third person, the alleged shooter, had not yet been captured, the police knew that possibly two firearms that were recently in the possession of people who were involved in a mid-day urban shootout were unaccounted for and had the strong possibility of being used in the wake of the alley shootout. Finally, and most importantly, the court finds that it was reasonable for the police to suspect that the third man – the shooter – choose to not linger in the cold alley after he shot at the victim, but instead followed that victim and his running cohort toward the easily accessible apartment sanctuary to finish what the shooter had started in the alley. In short, the police were faced with the serious probability that severe danger lurked in the 1830A apartment.

However, probability – that is "a good reason" to suspect that evidence of a crime exists or that an individual suspected of a crime is in a certain location – is not the standard by which the government must show that the protective sweep was justified. *See Hanson v. Dane County*, 608 F.3d 335, 338 (7th Cir. 2010) (defining probable cause and noting that it does not require "certainty, or even more likely

than not, that a crime has been committed or a medical emergency is ongoing.")

Indeed, as noted earlier in this order, "reasonable suspicion" is the standard that governs here, a lower threshold than probable cause, *Booker,* 579 F.3d at 839, that requires the police to be acting on more than a "hunch." *Gentry,* 597 F.3d at 845.

In the case of a protective sweep outside of the immediate vicinity of a detained suspect, the Supreme Court has held that reasonable suspicion must take the form of "articulable facts which, taken together with the rational inferences from those facts," would warrant believing that the area to be swept harbors someone posing a danger those on the scene. *Buie*, 494 U.S. at 334. This standard by no means requires absolute certainty by the law enforcement officials regarding the risks posed to them. *See United States v. Sholola*, 124 F.3d 803, 813 (7th Cir. 1997) ("[T]he 'reasonable suspicion' standard, by its very nature, allows for some degree of ambiguity or uncertainty."). Indeed, several Seventh Circuit cases have approved of protective sweeps employed in situations far less dire[13] than those confronting the police here and where the police based their actions on evidence that was, at best, inconclusive as to the dangers facing them in the area to be swept. *See, e.g., United States v. Barker*, 27 F.3d 1287, 1291 (7th Cir. 1994) (holding that knowledge of a gun in a home and the possibility that other people "might very well have been within" the home by an officer executing an arrest warrant justified a protective

---

[13] The court does not mean to imply that the police in the following cases were not in dangerous situations, such as executing an arrest warrant for a suspected felon. Rather, the court is merely noting that the police in the following cases did not find themselves in the midst of an urban shootout.

sweep); *United States v. Richards*, 937 F.2d 1287, 1292 (7th Cir. 1991) (holding that the police lawfully performed a protective sweep in searching for an unknown assailant who officers "did not know" was in the apartment, based on the knowledge that the person who answered the door was acquainted with the assailant, the apartment was in a dangerous neighborhood, and the police were not provided with a confirmation or denial that another suspect was in the house); *Tapia*, 610 F.3d at 511 (upholding the legitimacy of a protective sweep in the basement of the home when officers had some indication, such as a large van parked outside the home and knowledge that a home was used for violent gang members to congregate, that the home contained multiple parties); *Skrzypek*, 2011 U.S. App. LEXIS 13601, at *7-8 (holding that a protective sweep of an attic in a garage was lawful where the attic was open and there was knowledge of dangerous persons previously in the vicinity of the area being searched in the days before the sweep).  In this case, given the fairly lenient standard of reasonable suspicion, the court concludes that the police performed a protective sweep of the apartment on much more than a "hunch," but instead based their search on specific and articulable reasons.

The magistrate's report recommended granting the motion to suppress because the government had at best proven that "perhaps" a dangerous person remained in Mr. Delgado's apartment following Aviles and the defendant's exit from the apartment.  (Docket #12 at 12).  The fact that the magistrate could only conclude that "perhaps" a dangerous individual was in Delgado's apartment is not reason

alone to grant the motion to suppress. "Perhaps" merely implies uncertainty with outcome, *see Random House Dictionary of the English Language* 1439 (2d ed. 1987) (defining "perhaps" as "maybe, possibly"), a standard, as discussed above, inherent in police actions based on "reasonable suspicion." *Gentry,* 597 F.3d at 845. The issue is not whether the police were certain or uncertain in reasoning whether Mr. Delgado's apartment harbored a dangerous individual at the time the protective sweep occurred. *See Brown*, 64 F.3d at 1086 ("[T]he police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within . . . [t]he officers need *not demonstrate any danger*; they may look simply as a precaution") (emphasis added). Instead, the central issue is whether the police possessed a reasonable basis for an admittedly uncertain conclusion that the area to be swept harbored a dangerous individual based on "specific and articulable facts" and the rational inferences that could be made from those facts. *Buie,* 494 U.S. at 327. As discussed above, the government has articulated several facts that made it objectively reasonable to perform a protective sweep of the defendant's apartment.

The magistrate's report, in passing, seems to conclude that the detention of Mr. Delgado outside the 1830A apartment somehow eliminated whatever dangers were lurking in the apartment. (Docket #12 at 13) ("It is my opinion that the government has not demonstrated that here, especially after Delgado was handcuffed and placed in the police car."). However, the defendant was not the only

threat facing police on December 29, 2011. The police were confronted with an urban shootout in which the location of the firearm and the location of the person who had allegedly fired that gun were not completely known to the law enforcement agents at the scene. Given the apparent ease by which people could enter the 1830A apartment and the non-trivial risk that a shooter may have followed his target from the alley to their sanctuary, the court finds that Mr. Delgado's detainment did little to curb the potential risks facing the police in the apartment.

In support of the magistrate's recommendation, the defendant cites to the Sixth Circuit cases of *United States v. Colbert,* 76 F.3d 773 (6th Cir. 1996) and *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009). (Docket #14 at 6-7). Both cases stand for the proposition that a wholesale lack of information about the dangers lurking in a residence "cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Id.* at 778. In *Colbert*, for example, law enforcement agents, surveying the apartment of the girlfriend of a murder suspect, apprehended and handcuffed the suspect "forty to fifty feet" outside the apartment. *Id.* at 775. The suspect's girlfriend approached the police in a "hostile rage." *Id.* There was no indication the girlfriend was "armed or that she possessed contraband on her person." *Id.* The police, "concerned that somebody might . . . still be in" the apartment, opened the closed screen door of the apartment and entered, finding a shotgun leaning against a wall in plain view. *Id.* The law enforcement agents did not have a warrant to enter the apartment. *Id.* The Sixth Circuit

concluded that the police did not have "any information at all" about whether there was anyone in the apartment, let alone anyone in the apartment posing a threat to the police, and, accordingly, the appeals court found that there was no lawful ground for performing a protective sweep. *Id.* at 778. In *Archibald,* the police, in executing an arrest warrant for a probation violation by Mr. Archibald, knocked on the door of an apartment with a solitary entrance in search of the suspect. 589 F.3d at 292. After knocking repeatedly and hearing the sounds of "someone moving around inside" and asking for the defendant, the subject of the arrest warrant, to come to the door, the defendant complied. *Id.* Upon "grabbing" the defendant and "pulling" him away from the apartment, the police stepped inside the house and performed a protective sweep, finding narcotics in the kitchen. *Id.* at 293. The court concluded the "record contain[ed] no evidence, circumstantial or otherwise, of the presence of a dangerous third party in" the residence. *Id.* at 299.

Even if the court were to find the Sixth Circuit's reasoning persuasive and in line with the Seventh Circuit's seemingly more broad interpretations of the protective sweep doctrine – an fact that is in doubt, *see Brown*, 64 F.3d at 1086 ("[T]he police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within . . . [t]he officers need *not demonstrate any danger*; they may look simply as a precaution") (emphasis added) – the court finds both *Colbert* and *Archibald* are readily distinguishable. In both of those cases there was not even a scintilla of evidence supporting the conclusion that a dangerous individual

remained in the places that were eventually swept by the police. The best evidence supporting a protective sweep in either of the cases was the fact in the *Archibald* case that the police heard "noises" inside the apartment. However, in *Archibald,* the police readily conceded they "didn't know how many people were in the apartment" and were making a blatant and unwarranted assumption that multiple people were in the residence that was searched. 589 F.3d at 292. Given the dearth of evidence supporting the protective sweep in both cases, the Sixth Circuit had no choice but to conclude that the police were acting on a "hunch" when they entered the respective residencies to perform a sweep. Here, as discussed above, the police were not acting out of wholesale ignorance when they entered Mr. Delgado's apartment to perform a protective sweep; instead, there were specific facts that lead a reasonable officer to suspect that danger awaited those on the scene at 1830A 13th Street on December 29, 2010.

Perhaps more importantly, the facts of both *Colbert* and *Archibald* are distinguishable from the present case in that neither case presented facts, like the one before the court, in which the police were on the scene of the remnants of an urban shootout. The dangers facing the police on December 29, 2010, were real, as there was no doubt that shots had rang out mere moments before the police had arrived on the scene. Indeed, the court agrees with the conclusion of another Sixth Circuit case, which held that officers have the right to "secure [a] premises to ensure

the protection of everyone on the scene and to prevent the loss or destruction of the owner's property." *United States v. Johnson*, 9 F.3d 506, 510 (6th Cir. 1993).

The defendant makes a few other arguments worthy of note. Mr. Delgado suggests that there is "no evidence the officers claimed to have heard any shuffling coming from inside the apartment." (Def.'s Resp. Br. at 8). However, there is no basis in the law that the police need to hear some sort of a noise in an apartment to conclude that someone is in the residence. Indeed, the most devious of criminals would likely try to muffle any sounds he or she could make before attempting an ambush on the police. Here, there was other credible circumstantial evidence indicating that Mr. Delgado's apartment harbored dangerous parties. The defendant also argues that there was "no evidence that the officers asked Mr. Delgado or Mr. Aviles whether anyone was inside the apartment." (Def.'s Resp. Br. at 8). However, as noted earlier, the "court may not second guess how the police structure their priorities in an investigation," *United States v. Bell*, 500 F.3d 609, 614 (7th Cir. 2007), especially in the immediate aftermath of a mid-day shooting.

The court has one remaining comment with regard to the propriety of the protective sweep performed in this case. While the police were ultimately incorrect about whether a dangerous person remained in the 1830A apartment, and even about whether the apartment could have been accessed through another entrance, "courts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions that routinely incorporate danger."

*United States v. Castillo*, 866 F.2d 1071, 1079 (9th Cir. 1988).  While the defendant has strong Fourth Amendment interests at play in this matter, what should not be forgotten is that police officers also have the "right to ensure their safety and the safety of everyone else in the area" not only during the time they detained Mr. Delgado, but for the "remainder of the time that they were legally on the premises and its environs." *Burrows*, 48 F.3d at 1017.  Any alternate ruling by the court would present a truly frightening situation, where the police would be "forced to suffer preventable risk of ambush." *Tapia*, 610 F.3d at 511.  While hindsight indicates the police were incorrect in their reasonable conclusion that danger lurked in Mr. Delgado's apartment, the court finds it better to be proven wrong after a protective sweep has occurred to dispel the police's reasonable suspicions, than to impose a rule that law enforcement agents cannot secure an open apartment from where the participants in a mid-day shootout just exited and risk real danger to the police in a future case.  Accordingly, the court finds that the City of Milwaukee Police lawfully entered and searched Mr. Delgado's residence.   As such, the court will deny the motion to suppress with respect to the firearms and ammunition found during the police's search of the defendant's apartment.   The court proceeds to resolve the *Miranda* issue.[14]

---

[14] The court exercises its discretion to not recommit the *Miranda* issue to the magistrate for further consideration.  28 U.S.C. § 636(b)(1).

**C.  Were the statements made by Mr. Delgado in response to Officer Podlesnik's questioning obtained in violation of the defendant's right against self-incrimination?**

*Miranda* and its progeny hold that "before police can initiate custodial interrogation of a defendant, they must advise the defendant of certain rights."  *See United States v. Shlater*, 85 F.3d 1251, 1255-56 (7th Cir. 1996).  Put another way, "[q]uestioning initiated by law enforcement officers after a suspect has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by *Miranda* warnings.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Here, there is no real question that Mr. Delgado was significantly deprived of his freedom of action when he was asked a series of questions as he was handcuffed and sitting in a police car.  Accordingly, generally before any questions were posed to Mr. Delgado, he should have been read his *Miranda* rights.  *See Smith,* 3 F.3d at 1097 ("[F]ifth and Sixth Amendment rights are implicated before a defendant has been arrested.").

However, the government argues that the "kinds of questions asked of [Delgado] were in the nature of 'general-on-the-scene' questioning" and, therefore, are exempted from the rule of *Miranda*.  (Docket #10 at 9).  The court agrees in part with the government's assertion.   Not all questions posed by the police to a person in custody entail "interrogation," which, in turn, invokes the *Miranda* rules.  *See Rhode Island v. Innis*, 446 U.S. 291, 301(1980) (holding that "interrogation" entails "any words or actions on the part of the police (other than those normally attendant

-33-

to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") For example, a "request to search a . . . home" has been deemed to not fall under the rubric of "interrogation," and, accordingly, *Miranda* does not protect Mr. Delgado from having the statements he made in response to such a request used in the government's case-in-chief against the defendant. *United States v. Bustamante*, 493 F.3d 879, 892 (7th Cir. 2007). Moreover, the court finds the question posed about who lived in the 1830A apartment to not necessarily elicit an incriminating response and to be the kind of "general-on-the-scene questioning" as to the facts surrounding a crime that are necessarily allowed without prior warnings under the rule of *Miranda,* 383 U.S. at 477-78. As such, Mr. Delgado's statements in regard to who resided at the apartment in question will not be suppressed. However, the inquiries asked regarding the defendant's criminal history are a far cry from a simple question regarding the identity of an individual, the type of question at issue in *United States v. Adegbite*, 846 F.2d 834, 838-39 (2d Cir. 1988), a case cited by the government. Questions about a defendant's criminal history are not asked for the purpose of obtaining *basic* identifying data for arrest and custody, making Mr. Delgado's answers to such questions ripe for suppression. *See United States v. Perkins*, No. 95-50442, 1996 U.S. App. LEXIS 20603, at *3 (9th Cir. Cal. Aug. 15, 1996) (holding that a defendant's response to the "police question which asked whether [he] had ever been arrested" should be suppressed under *Miranda*).

The government also argues, citing to *New York v. Quarles*, 467 U.S. 649, 655-56 (1984), that because threats to public safety were "immediate issues in the circumstances of defendant Delgado's detention, police were not required to give [*Miranda*] warnings." (Docket #10 at 9). This argument is without merit. There were no apparent immediate threats to public safety *after* the protective sweep of the apartment ended that required the police to ask Mr. Delgado about his previous arrest record. The public safety exception is a "narrow" one, and when the "danger inherent in a confrontation has passed, so has the basis" for the exception. *United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006). Moreover, there is no reason to conclude that the questions posed to Mr. Delgado were "reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656. Here, the police officer was asking Mr. Delgado about his *past* criminal record; it is difficult to see how any of the answers Mr. Delgado gave while being handcuffed in a police car would have had an immediate influence on the safety of those in the general vicinity.

The government contends that the police would have "inevitably discovered that defendant Delgado was a convicted felon from their own records." (Docket #10 at 9). While the government's argument is well taken and unrebuked by the defendant, the government's assertion does not wholly resolve the issue. The doctrine of inevitable discovery is an exception to the exclusionary rule that renders illegally obtained evidence and its fruits admissible if the evidence would have been discovered by legal means absent the illegality. *Nix v. Williams*, 467 U.S. 431, 444

(1984). Here, the "fruit" of Mr. Delgado's statement is, as best the court can tell, his actual police record. However, as the government notes, the rule of *Miranda* only excludes testimonial evidence, so, accordingly, applying the inevitable discovery doctrine with regard to the physical fruits of the illegally obtained evidence is unnecessary. Moreover, with regard to the actual illegally obtained evidence – Mr. Delgado's statements to Officer Podlesnik – there is no basis for the claim that the government could have obtained the statements Mr. Delgado made to the law enforcement agent inevitably. As a consequence, the court will grant the defendant's motion to suppress with respect to the statements the defendant gave to the police with respect to his previous criminal record. While the value for the defendant of this court granting the motion to suppress with respect to the *Miranda* issue is likely minimal,[15] the court's order must reflect the prohibition on Mr. Delgado's own statements being used against him in the prosecutor's case-in-chief.

Accordingly,

**IT IS ORDERED** that Magistrate Callahan's recommendations (Docket #12) be and the same are hereby **ADOPTED IN PART**;

**IT IS FURTHER ORDERED** that the defendant's motion to "suppress physical evidence based on warrantless and nonconsensual search of his residence and his statements based on Miranda violation" (Docket #8) be and the same is hereby

---

[15] This is particularly true given the prosecutor's statement that Mr. Delgado's arrest was also based on his possession of a sawed-off shotgun, "an illegal act even for a non-felon." (Pl.'s Resp. Br. at 9).

**GRANTED in part** and **DENIED in part;** evidence in the form of "any and all statements" the defendant made "in response to questioning by City of Milwaukee Police Officer Glenn Podlesnik" with respect to the defendant's criminal history be and the same are hereby **SUPPRESSED**.

Dated at Milwaukee, Wisconsin, this 26th day of August, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge